**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| | : | |
| KIRTISH PATEL, | : | |
| | : | Civil Action No. 18-14628 (SDW) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent. | : | |
| | : | |

APPEARANCES:

CAROLINE CINQUANTO, Esq.
Law Firm of Caroline Goldner Cinquanto
123 S. Broad Street, Suite 2500
Philadelphia, PA 19109
          On behalf of Petitioner

STACY A. BIANCAMANO
Biancamano Law
42 A North 20th St.
Kenilworth, NJ 07033
          On behalf of Petitioner

NICOLE F. MASTRIOPIERI, Assistant United States Attorney
United States Attorney's Office
970 Broad Street
Assistant United States Attorney Newark, NJ 07102
          On behalf of Respondent

**WIGENTON**, District Judge

        Presently before the Court is Petitioner Kirtish Patel's ("Mr. Patel") amended motion to

vacate sentence under 28 U.S.C. § 2255, challenging his criminal conviction and sentence in

Criminal Action No. 15-593 (D.N.J.).[1]  (ECF No. 10).  Mr. Patel pled guilty to one count of health care fraud in violation of 18 U.S.C. § 1347.  The Government filed an answer to the amended § 2255 motion (Civ. ECF No. 16), and Mr. Patel filed a reply brief.  (ECF No. 20).  This Court granted Mr. Patel's motion to stay while he pursued a related FOIA request.  (Civ. ECF Nos. 21, 22).  This action was reopened on January 3, 2022, upon completion of the FOIA proceeding.  (Civ. ECF No. 28).  This Court granted Mr. Patel's motion to file a supplement to his amended motion to vacate under § 2255 (Civ. ECF No. 36), based on information he obtained in the FOIA proceedings.  On June 10, 2022, the Government filed a brief opposing Mr. Patel's supplement to his amended § 2255 motion.  (Civ. ECF No. 43).  This Court granted Mr. Patel's request to file a reply brief, without deciding his request for an evidentiary hearing on the merits of his ineffective assistance of counsel claims.  (Civ. ECF No. 58).  On November 11, 2022, Mr. Patel filed a motion for leave to file a declaration in support of his amended § 2255 motion.  (Civ. ECF No. 59).  The Government did not respond.  For the reasons set forth below, pursuant to Federal Rule of Civil Procedure 78, based on the pleadings and briefs, this Court will deny the amended § 2255 motion and the remaining motions without oral argument.

## I.    BACKGROUND

Kirtish Patel ("Kirtish" or "Mr. Patel") pled guilty to federal health care fraud involving Medicare and private insurers, through a scheme in which he used forged physician signatures to create false diagnostic reports purportedly written by physicians who had read and interpreted the results, and by false pretenses claiming neurological diagnostic tests were supervised by a

---

[1] Docket Entries in Criminal Action No. 15-592 are cited herein as ("Crim. ECF No."), and docket entries in this Civil Action, No. 18-14628, are cited herein as ("Civ. ECF No.")

physician.[2]  (Crim. ECF No. 29 at 1).  According to a stipulation in the plea agreement, although not binding on the sentencing judge, Mr. Patel and his wife Nita Patel were paid more than $4,386,133.75, with payments from Medicare accounting for $1,668,954.95 of the total amount, as a result of their scheme to defraud.  (*Id.* at 9).

## A.     The Information

On November 17, 2015, Mr. Patel was charged by Information with defrauding Medicare and private insurers from in or about September 2006 through in or about June 2014, in Morris County, New Jersey, in violation of 18 U.S.C. § 1347.[3]  (Crim. ECF No. 25)  The factual

---

[2] "Medicare regulations require all diagnostic testing to be 'reasonable and necessary,'  as defined under Medicare Part B. In order for diagnostic neurological testing to be 'reasonable and necessary,' it must be performed under the proper level of physician supervision."
*United States ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 311 (3d Cir. 2019) (citing 42 U.S.C. § 1395y(a)(1)(A), 42 C.F.R. § 410.32(b)(1); 42 C.F.R. § 411.15(k).)

[3]   18 U.S.C. § 1347(a, b) provides:

> (a) Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice--
>
> (1) to defraud any health care benefit program; or
>
> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both.
>
> (b) With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.

allegations are summarized as follows.  Mr. Patel was the owner of Biosound Medical Services Inc., ("Biosound") and his wife, Nita Patel, owned Heart Solution PC ("Heart Solution"), and both corporations offered mobile diagnostic testing, including echocardiograms, ultrasounds and nerve conduction studies, that were performed on-site at a physician's office. The Patels, who were not physicians, operated Biosound and Heart Solution.  Biosound was a Medicare-approved provider since 1999, and Heart Solution was a Medicare-approved provider since 2011.  Private insurance companies and Medicare reimbursed Biosound and Heart Solution for performing and interpreting diagnostic tests including:  1) echocardiograms to diagnose heart conditions; 2) ultrasounds to detect blood clots and abdominal aortic aneurysms; and 3) carotid ultrasounds to detect risk of stroke.  Medicare required independent diagnostic companies like Biosound to have a licensed subspecialist physician on staff to supervise and interpret tests performed in a particular subspecialty.

The scheme began with a referring doctor's request for a diagnostic test.  In response, an employee of Biosound, often Kirtish Patel, went to the referring physician's office to administer the diagnostic test.  Biosound then transmitted a diagnostic report to the referring doctor, which had purportedly been reviewed and interpreted by a physician ("Reading Doctor").  At least as early as October 2008, the Patels stopped sending Biosound diagnostic reports to a Reading Doctor.  Mr. Patel, who was not a physician, authored the reports himself.  His wife, Nita Patel, affixed a doctor's signature to the reports and sent them back to the referring doctors.  The referring doctors, believing the reports to have been interpreted by licensed specialist physicians, relied on the reports in making treatment decisions for patients.  The Patels forged Reading Doctors' signatures on more than half of the thousands of diagnostic reports performed by

Biosound.  Biosound employees became concerned that the Patels were not sending the reports to a licensed specialist physician for interpretation, and Mr. Patel responded to them by saying "why should I pay these doctors when I can read them?"

Beginning around September 2006, Mr. Patel represented to Medicare that Biosound would begin performing neurological diagnostic testing, and that Biosound had a supervising physician.  The physician, however, never agreed to supervise Biosound's testing.  Thus, from September 2006 through June 2014, the neurological testing done by Biosound was not supervised by the physician Mr. Patel claimed to have on staff.  But for this fraudulent representation, Medicare would not have approved Biosound as a provider or paid for the neurological testing performed for Medicare beneficiaries.  The Patels were paid more than $4,386,133.74 by Medicare and private insurance companies for diagnostic tests and reports that were not interpreted by a licensed physician, and neurological diagnostic tests that were not supervised by a licensed neurologist.  The Government sought forfeiture of all property and gross proceeds derived from the commission of the offense, pursuant to 18 U.S.C. § 982(a)(7).

**B.      The Plea Agreement**

On November 17, 2015, Mr. Patel executed a written plea agreement with the Government, pleading guilty to the Information.  (Crim. ECF No. 29).  In exchange for Mr. Patel's guilty plea, the Government agreed not to initiate any further criminal charges against him for forging physician signatures or obtaining health care benefits from Medicare or Medicaid under false pretenses for the period from September 2006 through June 2014.  The plea agreement stated that:  (1) the statutory maximum term of imprisonment was ten years; (2) the statutory maximum fine was the greatest of $250,000, or twice the gross amount of any pecuniary gain that any persons derived from the offense, or twice the gross amount of any

pecuniary loss sustained by any victims of the offense; (3) in addition to any fine, the sentencing court must order forfeiture pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461; and (4) the sentencing court may order restitution.

The Government did not make any promises about the sentencing guidelines range or the ultimate sentence to be imposed by the sentencing court. As to forfeiture, the parties agreed the amount of money judgment imposed by the Court "shall be equivalent to the amount of the loss involved in the criminal conduct pursuant to U.S.S.G. § 2B1.1(b)(1)". Further, Mr. Patel agreed to make full restitution for all losses resulting from the offense of conviction, as determined by the Court at sentencing.

Pursuant to the plea agreement, Mr. Patel stipulated that the Patels were paid more than $4,386,133.75 by the victims. This stipulation did not bind the sentencing judge. The stipulation did not bind the Government to the extent that the Government obtained, prior to sentencing, any conflicting credible, material information on losses. Mr. Patel acknowledged in writing that he had discussed the plea agreement with his attorney. Further, he acknowledged that he read the plea agreement and wanted to plead guilty.

## C.     The Plea Hearing

On November 17, 2015, Mr. Patel entered a guilty plea before the late Honorable William H. Walls, U.S. District Judge. (Crim. ECF No. 30). Mr. Patel was represented by Attorney Anthony Fusco, Jr. (*Id.* at 3). Judge Walls explained that Mr. Patel had no obligation to plead guilty, and he retained the right to have the case presented to a grand jury. If indicted, he had the right to a jury trial with the presumption of innocence and other attendant rights. (*Id.* at 10-12). By pleading guilty, Mr. Patel was waiving those rights. (Crim. ECF No. 30 at 12). Judge Walls informed Mr. Patel that his sentencing exposure was ten years in prison with a

6

period of supervised release, and a potential fine of $250,000, or twice the gross loss of the

victims, or twice the gross gain resulting from the scheme to defraud.  (*Id.* at 13).  Mr. Patel

acknowledged that he would be required to pay restitution and that he wanted to plead guilty.

(*Id.* at 13-16).  He understood that in exchange for his guilty plea, the Government would not

bring any further criminal charges based on his charged conduct for the period of September

2006 through June 2014.  (*Id.* at 16).  Mr. Patel also understood that his sentence would be

imposed at the sentencing court's discretion, after hearing arguments from the attorneys and

reading the presentence report ("PSR") from the United States Probation Office.  (*Id.* at 16-17).

Judge Walls reviewed with Mr. Patel the stipulations contained in the plea agreement.

(*Id.* at 18-20). Mr. Patel stipulated that he and his wife received $4,386,133.75 from Medicare

and private insurance companies, labeled Payor Group A in the PSR:

> for false diagnostic reports that purported to be written by actual
> physicians but, in fact, were never reviewed or authored by any
> physicians, and, two, neurological diagnostic reports for which
> there was no supervisory physician of the neurological testing
> being performed.

(*Id.* at 18-19).  He further stipulated there were other insurance companies who suffered losses

from the fraud, Payor Group B, who had not yet been identified, and their losses would be

calculated in the same manner as Payor Group A.  (*Id.* at 19).  He stipulated that the offense

involved ten or more victims; one of the victims was a federal health care plan, which paid the

Patels $1,668,954.95; and the offense involved the conscious or reckless risk of death or serious

bodily harm.  (*Id.* at 20).  Mr. Patel agreed to waive his right to appeal or collaterally attack the

sentence, unless the sentence fell outside the statutory maximum term or fine, but he reserved the

right to challenge his criminal history category.  (Crim. ECF No. 30 at 21-22).  Mr. Patel further

agreed to forfeiture of money equal to all property derived directly or indirectly from the gross

proceeds traceable to the fraud.  (*Id.* at 22-23).  The plea agreement called for the Court to

determine the amount of loss involved in the criminal conduct, and for the forfeiture to equal that

amount.   (*Id.* at 23).

Judge Walls advised Mr. Patel of the following provision in the plea agreement:

> This agreement is only between you and this United States
> Attorney for this District of New Jersey, Mr. Patel. It's not binding
> upon any other Federal, state, or local law enforcement agencies,
> nor is it binding upon any civil authorities, such as the Internal
> Revenue Service. It's not binding on any third parties who might
> wish to bring administrative or civil litigation against you.

(*Id.* at 28-29).  Mr. Patel indicated that he had not been threatened or coerced into accepting the

plea offer, he had enough time to think about it and discuss it with his attorney, and he was

satisfied with his attorney's representation.  (*Id.* at 29).

Judge Walls then asked Mr. Patel to affirm the following, prior to the Court's acceptance

of his plea:

> The COURT:  … Mr. Patel, let's turn now to the period of 2006
> through 2014. Did you and your wife, who I understand is in court,
> whose name is Ni[t]a, did you and your wife own and operate a
> mobile or own a mobile diagnostic company, Biosound Medical
> Services and Heart Solution, PC?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Where were they located?
>
> THE DEFENDANT: In Parsippany.
>
> THE COURT: In Parsippany?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Now, did Biosound Medical Services and Heart
> Solution PC provide diagnostic testing services to Medicare
> patients?
>
> THE DEFENDANT: Yes.

THE COURT: And did they bill Medicare programs for those testing services that you claimed you had provided?

THE DEFENDANT: Yes.

THE COURT: And as part of that diagnostic work that you claim you provided, did that include having a licensed specialist physician review and interpret the diagnostic values recorded by diagnostic technicians such as yourself?

THE DEFENDANT: Yes.

THE COURT: And did you know that the doctors who ordered the diagnostic services relied upon those diagnostic reports that they believed had been prepared by licensed specialist physicians in order to make important treatment decisions for their patients?

THE DEFENDANT: Yes.

THE COURT: And during this time period or during the time period of October 2008 to June of 2014, did you decide to write many of the diagnostic reports that were supposed to have been written by a licensed specialist physician?

THE DEFENDANT: Can I get a minute?

THE COURT: You certainly may.

(Off the record discussion between the Defendant and defense counsel)

THE DEFENDANT: Yes.

THE COURT: And did you at this time have any medical license of any kind?

THE DEFENDANT: Diagnostic testing facility.

THE COURT: I'm talking about, were you licensed as a physician --

THE DEFENDANT: No.

THE COURT: -- or medical doctor?

THE DEFENDANT: No.

THE COURT: So when you fraudulently interpreted and wrote a diagnostic report, that is to say, you wrote it as though you were an appropriately trained physician, did you or your wife then attach a forged specialist physician signature to that report to make it look like an actual physician had actually authored the report?

THE DEFENDANT: Yes.

THE COURT: Did you author and forge specialist physician signatures on diagnostic reports intended to assess a physician's risk of serious medical conditions such as heart defects, blood clots, abdominal or aortic aneurysms, and stroke?

MR. FUSCO: Just one second, Judge.

THE COURT: Yes.

(Off the record discussion between the Defendant and defense counsel)

THE DEFENDANT: Okay.

MR. FUSCO: Yes. The answer is yes to seven.

THE COURT: Okay. You said yes?

THE DEFENDANT: Yes.

THE COURT: Now, during the time period of 2006 through 2014, did you falsely represent to Medicare that the neurological testing being performed at Biosound Medical Services was being supervised by licensed neurologists when, in fact, it was not?

THE DEFENDANT: Yes.

THE COURT: And did you make this false representation -- well, false representation to Medicare knowing that it was false?

THE DEFENDANT: Yes.

THE COURT: Did anyone put a gun to your head, literally or figuratively, to make you do that?

THE DEFENDANT: No.

THE COURT: H'm?

THE DEFENDANT: No.

THE COURT: You did that of your own free will; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: Is it so that both Biosound Medical Services and Heart Solution PC were paid more than $4,386,133.75 by Medicare and five insurance companies for claims submitted by diagnostic testing and reports that were never interpreted by any licensed physician, and as well as for neurological diagnostic testing that were never licensed -- or strike that -- were never supervised by a licensed neurologist?

THE DEFENDANT: Yes.

THE COURT: Is that so? And were your company, that is, Biosound Medical Services and Heart Solution PC, paid at least $1,668,954.95 by Medicare for claims submitted for diagnostic testing and reports that had never been interpreted by either a licensed physician or neurologist?

THE DEFENDANT: Yes.

THE COURT: Is that true?

MS. WALSMAN: Your Honor, --

THE COURT: I'm sorry?

MS. WALSMAN: -- you modified the question slightly in your reading of it. There were diagnostic tests that were never interpreted by a licensed physician and then neurological diagnostic testing.

THE COURT: It's the same thing.

MS. WALSMAN: It's a little different, Your Honor.

THE COURT: In other words, you got at least more than $1 million for claims made for diagnostic testing and reports that had never been interpreted by a licensed physician and for neurological

diagnostic testing that had never been supervised by a licensed neurologist; is that correct?

THE DEFENDANT: Yes.

THE COURT: You did all of this of your own free will?

THE DEFENDANT: Yes.

THE COURT: And at the time that you submitted these claims to a Medicare program for diagnostic reports that were not authored by actual doctors or neurological testing that was not supervised by a licensed neurologist  who happens to be a doctor, did you know that doing so was illegal and against our law?

THE DEFENDANT: Yes.

THE COURT: Are you pleading guilty to this because you are, in fact, guilty?

THE DEFENDANT: Yes.

(Crim. ECF No. 30 at 31-37).  Judge Walls accepted Mr. Patel's guilty plea after confirming that he read the plea agreement and the waiver of indictment and had no further questions.  (*Id.* at 37-38).

## D.     The PSR

In Mr. Patel's presentence report ("PSR"), the U.S. Probation Department calculated the sentencing offense level using the November 1, 2015 Guidelines Manual.[4]  (PSR ¶ 28).  U.S.S.G. § 2B1.1 is the relevant guideline for loss calculations under 18 U.S.C. § 1347.  Application Note 1 to  § 2B1.1 defines "Federal health care offense" as it is defined in 18 U.S.C. § 24(b):

> any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

---

[4]  Available at https://www.ussc.gov/guidelines/guidelines-archive/2015-guidelines-manual. (last visited January 12, 2023).

Application Note 1 defines "Government health care program" as:

> any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by federal or state government. Examples of such programs are the Medicare program….

Application Note 3 governs "Loss Under Subsection (b)(1)," and provides, in relevant part:

> (A) General Rule.—Subject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss.
>
> > (i) Actual Loss.—"Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.
>
> . . .
>
> (C) Estimation of Loss.—The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference. See 18 U.S.C. § 3742(e) and (f).
>
> The estimate of the loss shall be based on available information….
>
> (E) Credits Against Loss.—Loss shall be reduced by the following:
>
> > (i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.
>
> . . .
>
> (F) Special Rules.—Notwithstanding subdivision (A), the following special rules shall be used to assist in determining loss in the cases indicated:
>
> . . .
>
> > (v) Certain Other Unlawful Misrepresentation Schemes.— In a case involving a scheme in which (I) services were fraudulently rendered to the victim by persons falsely posing as licensed professionals; . . . loss shall include the

> amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services.

With this background, the Probation Office started with a base offense level of six, pursuant to § 2B1.1. (PSR, ¶ 50). The base offense level was increased by 18 levels because the loss was at least $4,386,133.75. (*Id.*, ¶ 51). Two levels were added, pursuant to § 2B1.1(b)(2)(A), for ten or more victims. (*Id.*, ¶ 52). Two levels were added, pursuant to § 2B1.1(b)(7)(A)(B)(i), because the offense was against Medicare, and the loss to Medicare was more than one million dollars. (*Id.*, ¶ 53). Two more levels were added, pursuant to § 2B1.1(b)(15)(A), because the offense involved the conscious or reckless risk of death or serious bodily injury. (*Id.*, ¶ 54). This resulted in an offense level of 30. (*Id.*, ¶ 58). Three levels were deducted for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a, b). (*Id.*, ¶¶ 60, 61). The total offense level was 27. (*Id.*, ¶ 62).

The total loss, including Payor Groups A and B, was $4,803,875.40. (*Id.*, ¶ 33). In determining the loss amount, the Probation Office applied Application Note 3(F)(v) to § 2B1.1. Thus, it was recommended that Mr. Patel, who falsely represented that the test reports were written by licensed physicians, was not entitled to a deduction for the value of performing the diagnostic tests. (PSR, ¶ 31).

**E.      Sentencing Hearing**

This Court takes judicial notice under Federal Rule of Evidence 201(b),[5] that in sentencing Ms. Patel immediately before Mr. Patel, Judge Walls adopted the recommended

---

[5] See *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999) (courts may "may take judicial notice of another court's opinion—not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity.")

Guidelines range of 30 and the loss amount of $4,803,875.40 from Ms. Patel's PSR, and granted an adjustment for acceptance of responsibility, over the Government's opposition, which reduced the base offense level to 27.  *United States v. Patel*, 17cv7485 (WHW) (D.N.J.) (ECF No. 27 at 65-134).  Attorney Shay Desphande represented Mr. Patel at the sentencing hearing on August 16, 2016.  (Crim. ECF No. 42 at 1).  Mr. Desphande focused his argument on Mr. Patel's acceptance of responsibility for his conduct.  (*Id.* at 3, 5-7).  Mr. Desphande also attempted to convince Judge Walls that there was value to the performance of the diagnostic tests, despite his rejection of the same argument in Ms. Patel's sentencing hearing.  (*Id.*)  Judge Walls again rejected this argument.  (*Id.* at 5).  Mr. Desphande then requested a downward departure to allow Mr. Patel to care for his wife while she recovered from illness.  (*Id.* at 7).

The Government objected to Mr. Patel receiving a three offense level deduction for acceptance of responsibility because, after he pled guilty, he claimed that not all of the neurological tests were unsupervised, and that he was not responsible for the fraud associated with his wife's company, Heart Solution.  (*Id.* at 13).  He also attempted to minimize the risk his conduct posed to the patients.  (*Id.* at 14-15). The Government submitted that when the Patels were arrested and agreed to provide the Government with a list of patients whose tests were not read by a physician, the list they produced fell woefully short of the actual number of fraudulent tests. (Crim. ECF No. 42 at 17-18). Thus, the Government sought a top of the Guidelines range sentence.  (*Id.* at 15-16).

Judge Walls found that Mr. Patel was responsible for restitution in the amount of $4,803,875.40.  (*Id.* at 18).  He also found that Mr. Patel had not accepted responsibility for his actions because he had minimized the risk of harm from his conduct.  (*Id.* at 24-25). Judge Walls

found an offense level of 30, with a Guidelines range of 97 to 121 months imprisonment.  (*Id.* at 26).  He imposed a prison term of 100 months and waived the fine.  (*Id.* at 26-28).

## II.  Proceedings Under 28 U.S.C. § 2255

On October 2, 2018, Mr. Patel filed his original § 2255 motion.  (Civ. ECF No. 1).  He filed the operative amended § 2255 motion on June 8, 2019.  (ECF No. 10).  This matter was stayed on April 22, 2020, while Mr. Patel pursued a FOIA request for documents related to the loss calculation by the Government.  (ECF Nos. 21, 22, 28).  Upon reopening the case on January 3, 2022, Mr. Patel filed several subsequent motions, adding new claims and requesting an evidentiary hearing.  The Government opposed the motions.  Finally, Mr. Patel filed a motion to submit a declaration in support of his amended § 2255 motion, and the Government did not respond.

## A.  The Amended § 2255 Motion

Mr. Patel raises the following claims of ineffective assistance of counsel in his amended § 2255 motion.  First, his attorney failed to explain the difference between pleading guilty with an agreement versus pleading open.  Mr. Patel claims he was prejudiced because he did not get a three offense level deduction for pleading guilty with an agreement, and he did not preserve his appellate rights.

Second, Mr. Patel contends he had no reason to know that the sentencing court would adopt the stipulated loss amount.  At sentencing, he expected his attorney to present evidence for a lower loss amount, but he was represented by last minute substitute counsel, who made only feeble attempts to argue for a lower loss amount.  Mr. Patel would not have pled guilty if he had known that by attempting to argue for a lower loss amount, he would lose credit for acceptance of responsibility.  Further, Mr. Patel would not have pled guilty if his lawyer had advised him

that the stipulation in his plea agreement would preclude him from challenging the amount of damages in a related civil case.  Once counsel became aware of the civil action, he should have advised Mr. Patel to withdraw from his plea agreement.

Third, at his sentencing hearing, Mr. Patel attempted to explain what led him to commit the health care fraud offense. He unwittingly caused the Court to believe he was not accepting responsibility for his actions by minimizing the risk to the patients.  His counsel failed to convince the Court otherwise.

**B.      The Answer**

The Government responded to each of Mr. Patel's claims of ineffective assistance of counsel.  Regarding the alleged failure of counsel to explain the difference between pleading guilty and pleading open, there was no distinction in the sentencing exposure.  (Civ. ECF No. 16 at 9-10).  Therefore, Mr. Patel was not prejudiced by choosing to plead guilty.  (*Id.*)  He understood and accepted the waiver of his appellate rights in the plea agreement, as evidenced by the colloquy before Judge Walls.  (*Id.*)  In the absence of extraordinary circumstances, a petitioner may not contradict his earlier sworn statements in a plea colloquy.  (*Id.*, citing *United States v. Lemaster*, 403 F.3d 216, 221-22 (4th Cir. 2005)).  Furthermore, Mr. Patel has not identified a meritorious appellate issue that he would have raised if he had pleaded open and preserved his appellate rights.  (Civ. ECF No. 16 at 11).

Next, the Government addressed the ineffective assistance claims based on the loss amount.  Mr. Patel's counsel argued for a reduction in loss amount based on Mr. Patel performing the diagnostic reports  The Government contends that defense counsel is not ineffective by failing to prevail on that argument.  (*Id.* at 13).

Further, defense counsel was not ineffective, the Government submits, for failing to advise Mr. Patel of the collateral consequences of his plea agreement on a subsequent civil action under the False Claims Act. (*Id.*) Moreover, Mr. Patel acknowledged during the plea colloquy before Judge Walls that the plea agreement did not bind any civil authorities or third parties from bringing administrative or civil actions against him. (*Id.*)

Finally, the Government argues that defense counsel was not ineffective, nor was Mr. Patel prejudiced by counsel's performance, simply because Judge Walls did not award a three point reduction in offense level for acceptance of responsibility. (*Id.* at 15-16). Mr. Patel's own remarks caused Judge Walls to determine he had not accepted responsibility, and defense counsel had urged the court to find otherwise. (*Id.*)

## C.    Reply Brief

In reply to the Government's answer, Mr. Patel asserts that he was prejudiced by his counsel's advice to sign a plea agreement that did not provide any consideration. Prejudice resulted because Mr. Patel waived his appellate rights and was unable to appeal the district court's denial of acceptance of responsibility under U.S.S.G. § 3E1.1, which potentially would have reduced his base offense level by three. (Civ. ECF No. 20 at 2). Mr. Patel states that he met the criteria for a downward adjustment based on acceptance of responsibility, and the district court erred by focusing on Petitioner's financial motive to save his company. (*Id.* at 2-10). Mr. Patel had a basis to appeal on the grounds that the district court abused its discretion in denying a three level adjustment for acceptance of responsibility. (*Id.* at 10).

Mr. Patel replied to the Government's claim that his counsel was not obligated to advise him of the collateral consequences of his plea agreement on subsequent civil litigation under the False Claims Act. (*Id.* at 11). He contends there is no categorical rule that counsel is not

required to advise a client of collateral consequences of a guilty plea, and all cases cited by the

Government are distinguishable.  (*Id.* at 11-16).  Mr. Patel relies on the American Bar

Association Standard 4-5.4, which provides, in pertinent part:

> (a) [d]efense counsel should identify, and advise the client of,
> collateral consequences which may arise from charge, plea or
> conviction…. (b) When defense counsel knows that a consequence
> is particularly important to the client, counsel should advise the
> client as to whether there are procedures for avoiding, mitigating,
> or later removing the consequence….

(*Id.* at 15).

Mr. Patel claims he did not fully understand that the plea agreement did not bind civil

authorities or any third parties from bringing administrative or civil litigation against him.  (*Id.* at

16).  In sum, Mr. Patel maintains that he made a sufficient showing to entitle him to an

evidentiary hearing on his ineffective assistance of counsel claims.  (*Id.* at 16-17).

**D.      Supplement to Amended § 2255 Motion**

After Mr. Patel completed his related FOIA proceeding, this Court permitted him to file a

supplement to his amended § 2255 motion, based on his claim that he had "a good faith basis for

this request on the grounds that the documents he obtained under the Freedom of Information Act

contain information that is relevant and critical to his claim of ineffective assistance of counsel."

(Civ. ECF No. 35).  In his supplement, Mr. Patel explained that he filed a FOIA request with the

U.S. Department of Justice to obtain documents regarding the Government's loss calculation.  (*Id.*

at 1, ¶ 2).  The Executive Office for United States Attorneys ("Executive Office") responded to the

FOIA request and disclosed that a document called "Proper Loss Calculation Memo" was missing

after an extensive search.  (*Id.* at 2-3, ¶¶ 4-6).  The Executive Office maintained that it likely would

have withheld the document anyway, based on privileges of attorney work product and deliberative

processes. (*Id.* at 3, ¶ 7).

Mr. Patel also stated that the FOIA request did not yield any evidence of his plea counsel requesting documentation to support the Government's loss calculation, nor that plea counsel independently investigated the loss amount.  In advance of sentencing, although Mr. Patel's plea counsel refuted the Government's loss amount, he offered no competent evidence in the alternative. (*Id.* at 4, ¶ 10).  As a result of counsel's deficient performance, the sentencing court relied on the stipulated loss amount, and when Mr. Patel tried to explain why the loss was inflated, his statements were used against him by denying his acceptance of responsibility.  (*Id.* at 5, ¶¶ 11, 12). If Mr. Patel had been advised that the stipulated loss amount would be the loss amount adopted by the district court, he would have pleaded open or gone to trial.  (*Id.* at 5-6, ¶ 13).  Finally, Mr. Patel requested a hearing on the timing and reason for the missing "Proper Loss Calculation Memo." (*Id.* at 6, ¶ 14).

**E.     Response in Opposition to the Supplement**

The Government filed a brief in opposition to Mr. Patel's supplement to his amended § 2255 motion.  (ECF No. 43).  Because Mr. Patel did not rely on any documents obtained in the FOIA litigation, the Government argues that he should not be permitted to raise new claims.  (*Id.* at 1).  The Government also opposes a hearing on the missing "Proper Loss Calculation Memo." According to the Government, the memo in question was attorney work product.  Therefore, it would not have been produced if found.  (*Id.* at 2).  Moreover, there was never any question about how the Government calculated the loss.  (*Id.*)  The Government added the total amount of money that Mr. Patel and his wife received for producing unsupervised neurological diagnostic reports during the relevant time period, to the total amount of money they received for producing false cardiac diagnostic reports, excluding echocardiograms, that were not reviewed or authored by a physician.  (*Id.*)

Finally, the Government asserts Mr. Patel's new claims do not arise out of the same conduct, transaction or occurrence alleged in the amended § 2255 motion, and are barred by the one-year statute of limitations. The new claims are:  1) plea counsel took no steps to investigate and verify the loss amount; 2) there was no evidence that plea counsel requested documentation supporting the Government's loss calculation; 3) plea counsel produced no competent evidence of an alternative loss amount; and 4) the Patels had a neurologist properly supervising the process for a period of time.  (*Id.* at 4).  In addition to these claims being barred by the statute of limitations, the Government argues the claims are meritless.  (*Id.* at 5-10).

**F.     Reply to Government's Opposition to the Supplement**

In his reply brief, Mr. Patel contends that his new claims relate back to his amended § 2255 motion, and the results obtained through his FOIA request are relevant and critical to his ineffective assistance of counsel claim.  (ECF No. 58).

**G.     Motion for Leave to File Declaration**

On November 11, 2022, Mr. Patel filed a motion for leave to file a declaration in support of his amended § 2255 motion.  (ECF No. 59).  Mr. Patel and his wife prepared declarations in support of his claim that "counsel failed to investigate the obvious deficiencies in the Government's loss calculation, and, thus, provided Mr. Patel with ineffective assistance of counsel by advising him to stipulate to a demonstrably overstated Guidelines loss adjustment." (*Id.*)  Mr. Patel explained that preparation of the declarations were delayed by Ms. Patel's ill health.  (*Id.*)  The Government did not respond to this motion.

**III.    DISCUSSION**

**A.     The Supplement to the Amended § 2255 Motion**

Federal Rule of Civil Procedure 15(d) governs supplemental pleadings, and it provides:

> [o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

Mr. Patel instituted FOIA proceedings on the Government's loss calculation after he filed his amended § 2255 motion. In those proceedings, he learned there was a missing document entitled "Proper Loss Calculation." Mr. Patel believes the document may have been intentionally lost or destroyed, and that it may contain evidence to support his ineffective assistance of counsel claims. This Court agrees with the Government on two points in opposition to the supplemental pleading: 1) an internal memorandum by the U.S. Attorneys involved in his criminal case on calculation of the loss for sentencing purposes was likely to be withheld under the attorney work product privilege;[6] and 2) the contents of the missing memorandum are immaterial because the PSR explains how the Government calculated the loss amount.

The Government was required, pursuant to 18 U.S.C. § 3664(d)(1), to consult with all identified victims and provide the Probation Office with a listing of the amounts subject to restitution. (PSR at ¶ 39). The Government provided such a list, broken into Payor Groups A and B, identifying each insurance company and its contact information, together with the loss amount for each victim. (PSR at ¶¶ 40, 41). Upon learning that not all cardiology reports were false, and excluding echocardiograms from the losses, the Government estimated the percentage of

---

[6] FOIA's Exemption 5, "allows the government to withhold records from FOIA disclosure under … the attorney work-product privilege." *Nat'l Ass'n of Crim. Def. Laws. v. Dep't of Just. Exec. Off. for United States Att'ys*, 844 F.3d 246, 249 (D.C. Cir. 2016) (citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980)). The privilege applies when "the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Id.* at 251 (quoting *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010) (quoting *Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998)).

cardiology tests that were fraudulent.  (PSR at ¶ 32).  This was accomplished by sending subpoenas to Biosound's referring doctors for Biosound diagnostic reports.  (*Id.*)  The Government then compared the Biosound diagnostic reports received from the referring doctors, for the years 2012-2014, with the Reading Doctors' records of reports they had actually authored/reviewed.  (*Id.*)  This resulted in the conclusion that 75% were false reports with forged signatures.  (*Id.*)  Therefore, the Government included only 75% of the loss amounts from the total paid by insurance companies for cardiology tests other than echocardiograms.  (*Id.*)  The Government made no deductions to the losses reported for neurological diagnostic tests because none of the tests were supervised by a neurologist.  (*Id.*)  Therefore, there is no need for an evidentiary hearing on the missing "Proper Loss Memo."

Mr. Patel also suggests that another new development arose from his FOIA proceeding, he failed to uncover evidence that his plea counsel requested documentation from the Government on its loss calculation or that his counsel did his own independent investigation of the loss amount. Mr. Patel could have raised an ineffective assistance of counsel claim for failure to independently investigate the loss amount when he filed his original or his amended § 2255 motion.[7]  This was not a new development that provides a basis to supplement the pleading.  Therefore, this Court will not further address the claims raised in the supplement to the amended § 2255 motion.

B.    **Motion for Leave to File Declaration**

Rule 7(a) of the Rules Governing Section 2255 Motions for the United States District Courts provides that "the judge may direct the parties to expand the record by submitting additional

---

[7] This Court takes judicial notice under Federal Rule of Evidence 201(b), that Ms. Patel, who shared joint representation with Mr. Patel in their criminal defense, raised these claims in her amended § 2255 motion, filed on December 12, 2017.  *Patel v. United States*, 17cv7485 (SDW) (D.N.J. Dec. 12, 2017, ECF No. 4).

materials relating to the motion. The judge may require that these materials be authenticated."  The types of materials that may expand the record include documents, exhibits and affidavits.  SECT 2255, Rule 7(b).

Mr. Patel seeks to submit into the record, long after the one-year statute of limitations expired, and well after briefing on the amended § 2255 motion concluded, declarations from himself and his wife that raise new factual allegations and new legal theories.  Mr. Patel had the opportunity to prepare and file a declaration in support of his § 2255 motion, or to seek an extension of time to file such a declaration, at least from the time he initiated this proceeding on October 2, 2018, through September 6, 2019, when he filed his reply brief in response to the Government's answer.  He was also given the opportunity to supplement the record with any new, relevant evidence discovered in his FOIA proceeding, but he did not obtain such evidence.  Mr. Patel seeks to inject new claims that were available to him when he filed his original or amended § 2255 motion.  Therefore, this Court will deny Mr. Patel's motion for leave to file declaration at this late stage in the proceeding.  *See generally* Rule 2, Rules Governing Section 2255 Cases for the United States District Courts (a § 2255 motion "must specify all the grounds for relief available to the moving party" and "state the facts supporting each ground.")

## C.    Legal Standards for § 2255 Claims

A prisoner in federal custody may file a motion under 28 U.S.C. § 2255 to challenge the validity of his or her conviction and sentence.  Section 2255 provides, in relevant part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255.

The Third Circuit summarized the legal standard for bringing a Sixth Amendment ineffective assistance of counsel claim:

> a criminal defendant may demonstrate that his representation was constitutionally inadequate by proving: (1) that his attorney's performance was deficient, i.e., unreasonable under prevailing professional standards; and (2) that he was prejudiced by the attorney's performance. [*Government of Virgin Islands v.*] *Forte*, 865 F.2d [59,] 62 [3d. Cir. 1989) (citing *Strickland*, 466 U.S. at 687, 694, 104 S.Ct. 2052). Under the first prong, "[j]udicial scrutiny ... is highly deferential," and courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 688–89, 104 S.Ct. 2052. In order to establish prejudice, the defendant must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. We have endorsed the practical suggestion in *Strickland* to consider the prejudice prong before examining the performance of counsel prong "because this course of action is less burdensome to defense counsel." *McCoy*, 410 F.3d at 132 n. 6; *see Strickland*, 466 U.S. at 694, 104 S.Ct. 2052 (stating that, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so," the prejudice prong should be examined before the performance prong "to ensure that ineffectiveness claims do not become so burdensome to defense counsel that the entire criminal justice system suffers as a result").

*United States v. Booth*, 432 F.3d 542, 546 (3d Cir. 2005). The same test applies to advice given by counsel in the context of guilty plea discussions. *Id.* at 546 (citing *Hill v. Lockhart*, 474 U.S. 52, 58 (1985)). In such cases, the petitioner must establish "that but for his trial attorney's alleged ineffectiveness, he would likely have received a lower sentence." *Id.* at 547. Alternately, a petitioner may establish prejudice by showing "that but for his counsel's purported errors, he would have gone to trial, received a more favorable plea deal, or have been better off pleading guilty without the benefit of a plea agreement." *Boye v. United States*, 810 F. App'x 118, 121 (3d Cir.

25

2020).

**D.    An Evidentiary Hearing is Not Required**

An evidentiary hearing should be granted in a § 2255 proceeding, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C.A. § 2255(b).  In making the determination whether to hold an evidentiary hearing, "the court must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record."  *Booth*, 432 F.3d at 545 (quoting *Government of the Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir.1989)).  For the reasons discussed below, the records in this matter conclusively show that Mr. Patel is not entitled to relief, and an evidentiary hearing will not be held.

**E.    Ground One:  "Ineffective Assistance of Counsel Regarding the Options Involved in Pleading Guilty Pursuant to an Agreement that Surrendered Appellate Rights or Pleading Open to Preserve Appellate Rights"**

Accepting as true Mr. Patel's claim that his counsel failed to explain the option of an open plea, he must establish prejudice to prevail on his ineffective assistance of counsel claim.  "An 'open' guilty plea is a plea made by the defendant without entering into a plea agreement with the Government.  *Booth*, 432 F.3d at 543 (citing. *e.g.*, *United States v. Casiano*, 113 F.3d 420, 423 (3d Cir. 1997)).  Mr. Patel argues he was prejudiced by not pleading open because if he had preserved his appellate rights, he would have succeeded on appealing the sentencing court's denial of an adjustment for acceptance of responsibility.  For the reasons discussed in Section III.H. below, Mr. Patel has not established a reasonable probability that he would have succeeded in appealing the sentencing court's denial of an adjustment for acceptance of responsibility.

More importantly, Mr. Patel ignores the fact that he received consideration for pleading guilty, which he would not have received if he pleaded open.  "To allow an otherwise valid plea

agreement to be undone because the defendant did not obtain 'enough' of a benefit would undermine the efficacy of such agreements by permitting the defendant to obtain the benefit of the bargain without suffering the detriment." *United States v. Williams*, 184 F.3d 666, 670 (7th Cir. 1999).  The Government agreed not to initiate any further criminal charges against Mr. Patel for forging physician signatures or obtaining health care benefits from Medicare or Medicaid under false pretenses for the period from September 2006 through June 2014.  Continued investigation of the scheme to defraud might have led to additional charges brought in an Indictment.  *See, e.g., United States v. Fabian*, 798 F. Supp. 2d 647, 672 (D. Md. 2011) (holding advice to accept plea offer and agree to statement of facts was objectively reasonable in consideration for not presenting additional charges in Indictment).  Additional charges would have increased Mr. Patel's sentencing exposure and potentially nullified any benefit he may have received for accepting responsibility for the one count charged in the Information. Mr. Patel received consideration for his guilty plea and has not established prejudice for not being advised of the option to plead open to preserve his appellate rights on the issue of acceptance of responsibility.

**F.    Ground Two:  "Ineffective Assistance of Counsel Regarding the Loss Amount"**

Mr. Patel asserts that he had no reason to believe his stipulated loss amount would be adopted at sentencing.  His counsel advised him that he would have the opportunity to argue why the loss amount was overinclusive.  He was represented by last minute substitute counsel at the sentencing hearing, who made only feeble attempts to argue for a lower loss amount.  Mr. Patel asserts he would not have pled guilty if his counsel had advised him that the stipulated loss amount would not be subject to challenge, or that by attempting to dispute the loss amount, he would risk losing an award for acceptance of responsibility.

The first part of this claim, that Mr. Patel did not have the opportunity to challenge the loss

amount at sentencing, is factually incorrect.  The plea agreement set forth that the stipulated loss amount would not govern sentencing, which would be determined by the sentencing judge.  (Crim. ECF No. 29).  At the plea hearing, Mr. Patel acknowledged that he had sufficient time to discuss the plea agreement with his attorney, and that he understood the terms of the plea agreement, which Judge Walls extensively reviewed with him.  (Crim. ECF No. 30).  Specifically, Judge Walls explained that he would determine the sentence after considering the arguments from both parties and reading the PSR from the Probation Office.  Even if Mr. Patel's counsel told him the sentencing judge would not impose the stipulated loss amount, such improper advice was cured by the plea colloquy.  *U.S. v. Fazio*, 795 F.3d at 428.  The plea agreement did not guarantee Mr. Patel would be successful in arguing for a lower loss amount. "[D]efense counsel's conjectures to his client about sentencing are irrelevant where the written plea agreement and in-court guilty plea colloquy clearly establish the defendant's maximum potential exposure and the sentencing court's discretion."  *United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).

The second part of this ineffective assistance of counsel claim is that Mr. Patel would not have pled guilty with a nonbinding stipulation of the loss amount if his counsel had advised him that challenging the loss amount would jeopardize an adjustment for acceptance of responsibility. In other words, Mr. Patel is claiming he would have been better off pleading open because he could have challenged the loss amount without raising an argument that was inconsistent with the plea agreement and, thus, potentially received an adjustment for acceptance of responsibility.

Under U.S.S.G. § 2B1.1(b)(1)(j, k), a loss amount between $3,500,000 and $9,000,000 calls for an eighteen level increase in the base offense level.  To reduce his offense level, Mr. Patel was required to establish the Government's estimated loss amount of $4,803,875.40 was overstated by more than one million dollars.  The Government obtained the loss amount from thousands of

diagnostic tests directly from the insurance companies who paid Biosound and Heart Solution for those tests during period of the scheme to defraud, and reasonably estimated the percentage of cardiology tests that were actually read by a Reading Doctor.  (PSR ¶¶ 32, 39-41). Mr. Patel has not established a reasonable probability that the Government's calculation was off by more than one million dollars.

Moreover, if Mr. Patel had pled open, he would not have received the Government's promise not to initiate additional charges against him based on his scheme to defraud.  Additional charges would have exposed him to a longer term of imprisonment and potential criminal fines. Mr. Patel has not established a reasonable probability that his sentence would have been more favorable if he pled open without a stipulated loss amount.  Therefore, this ineffective assistance of counsel claim fails.

**G.    Ground Three:  "Ineffective Assistance of Counsel Regarding the Failure to Advise Mr. Patel of the Collateral Consequences of His Plea Agreement and Stipulation of Fraud Amount"**

After Mr. Patel pled guilty,  a civil action was brought against him under the False Claims Act, and he was collaterally estopped by his guilty plea from challenging the amount of damages stipulated in his plea agreement.  *See United States ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 311 (3d Cir. 2019).  Mr. Patel submits that he would not have pled guilty if he had been advised of the collateral consequence on subsequent civil litigation.

First and foremost, Mr. Patel was advised by the terms of the plea agreement, and again during the plea colloquy, that his guilty plea did not preclude the Government or a third party from initiating a civil action against him based on the same criminal conduct.   *See U.S. v. Fazio*, 795 F.3d 421, 428-29 (3d Cir. 2015) ("any possible error in plea counsel's advice was cured by the ... plea colloquy".  Based on his affirmance in the plea colloquy that he understood this provision,

this Court rejects Mr. Patel's subsequent claim that he did not understand. *See*, *e.g.*, *U.S. v. Padillo-Castro*, 426 F. Appx 60, 63 (3d Cir. 2011) (holding that contrary to the defendant's assertions, the record showed he was properly informed of the mandatory minimum sentence upon his guilty plea). Having determined that Mr. Patel was aware of the possibility of civil litigation, this Court turns to whether his counsel was ineffective for failing to advise him that his guilty plea would collaterally estop him from taking an inconsistent position in subsequent civil litigation.

In *Padilla v. Kentucky*, the Supreme Court held that *Strickland's* ineffective assistance of counsel standard applied to a criminal defense attorney's failure to advise a defendant of the risk of deportation as a collateral consequence of pleading guilty. 559 U.S. 356 (2010). This was a new rule of constitutional law. *Chaidez v. U.S.*, 568 U.S. 342, 349 (2013). Until *Padilla*, the Supreme Court had not addressed the threshold question of whether advice about deportation was a collateral rather than direct consequence of a criminal conviction, and whether collateral consequences were 'categorically removed' from the scope of the Sixth Amendment right to counsel. 568 U.S. 342, 349 (2013) (quoting *Padilla*, 130 S.Ct. at 1482). Prior to *Padilla*, all ten federal appellate courts that had addressed the question, and 30 state appellate courts, held that counsel in criminal prosecutions were not required to give advice on noncriminal matters. *Id.* at 350. In *Padilla*, the Court did not answer whether the distinction between direct and collateral consequences was a generally appropriate question for courts to consider, but rather the Court "relied on the special 'nature of deportation'—the severity of the penalty and the 'automatic' way it follows from conviction—to show that '[t]he collateral versus direct distinction [was] ill-suited' to dispose of Padilla's claim." *Chaidez*, 568 U.S. at 355 (quoting *Padilla*, 130 S.Ct. at 1482)).

Similar to deportation, there are other "automatic" consequences that flow from pleading guilty. 31 U.S.C. § 3731(e), which governs False Claims Act litigation, provides:

> (e) Notwithstanding any other provision of law, the Federal Rules of Criminal Procedure, or the Federal Rules of Evidence, a final judgment rendered in favor of the United States in any criminal proceeding charging fraud or false statements, whether upon a verdict after trial or upon a plea of guilty or nolo contendere, shall estop the defendant from denying the essential elements of the offense in any action which involves the same transaction as in the criminal proceeding and which is brought under subsection (a) or (b) of section 3730.

This legislation has been in effect since the 1980s.  Nonetheless, there does not appear to be any precedent, before or after the *Padilla* decision, which requires criminal defense counsel to advise clients who are charged with fraud or false statements of the collateral estoppel effect on civil claims for damages.  In Padilla, the Supreme Court explained that deportation cases are different because the severity of the penalty, exile from the United States, is so severe that a defendant must be allowed to weigh the benefit derived from the guilty plea against the full consequences of the plea.  A civil judgment for money damages, even trebled damages under the False Claims Act, does not approach the severity of deportation.  Therefore, there is good reason to treat the consequence of deportation differently than the consequence of civil liability for Sixth Amendment purposes.  *See Parrino v. United States*, 655 Fed. Appx. 399, 403 (6th Cir. 2016) ("[t]he penalty of complete banishment from the United States is different in kind from the burden of five years' exclusion from federal health-care programs.")  This Court concludes that counsel was not ineffective for failing to advise Mr. Patel of the collateral consequences of his guilty plea.

**H.      Ground Four:  "Ineffective Assistance of Counsel Regarding the Acceptance of Responsibility and Sentencing Hearing"**

Mr. Patel alleges that his counsel's argument for acceptance of responsibility at the sentencing hearing was constitutionally deficient.  The sentencing guideline for acceptance of responsibility, U.S.S.G. § 3E1.1 (effective Nov. 1, 2015), provides:

> (a)  If  the  defendant  clearly  demonstrates  acceptance  of

responsibility for his offense, decrease the offense level by 2 levels.

(b) If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1 additional level.

Both of these elements were likely satisfied at the time of entry of Mr. Patel's guilty plea. However, the comments to U.S.S.G. § 3E.1.1 Acceptance of Responsibility, state that "[a] guilty plea does not entitle a criminal defendant to a three-level adjustment for acceptance of responsibility under the Sentencing Guidelines as a matter of right." U.S.S.G. § 3E1.1 Cmt. n. 3 (2015). Mr. Patel's acceptance of the plea agreement, and his acknowledgment of the terms of the plea agreement in the plea colloquy, establish that he was advised of the discretionary nature of receiving credit for acceptance of responsibility.

The Government ultimately opposed an award for acceptance of responsibility because it contended that Mr. Patel attempted to mitigate the scope and seriousness of his conduct, first in the False Claims Act litigation, then in his sentencing memorandum.[8] Thus, at the sentencing hearing, Mr. Patel's counsel focused on obtaining an award for acceptance of responsibility, stating that the earlier arguments for mitigating the loss amount were "technical" arguments by the lawyers, and were not intended to take away from the fact that Mr. Patel understood the risk his conduct posed to the patients. (Crim. ECF No. 42 at 2-8). Judge Walls seemed to accept counsel's explanation that the arguments for mitigating the loss amount were counsel's arguments, not Mr.

---

[8] Mr. Patel's sentencing memorandum was not docketed in the criminal docket, but is attached, under seal, as an exhibit to the Government's Brief in Opposition to Supplement to Amended Petition. (Civ. ECF No. 47).

Patel's true feelings about the seriousness of his conduct.  Judge Walls encouraged counsel to "stand your ground and say what you believe is appropriate legally for the benefit of your client. Always remember that."  (*Id.* at 8-9).

Judge Walls then gave Mr. Patel an opportunity to be heard.  (*Id.* at 9).  Mr. Patel said that he was deeply sorry, and he did not mean to harm anyone.  (*Id.* at 10).  Judge Walls was troubled by Mr. Patel's statement that he did not mean to harm anyone because interpreting diagnostic reports without a medical license risked lives.  (*Id.*)  Judge Walls asked Mr. Patel why he committed this fraudulent scheme.  (Crim. ECF No. 42 at 11).  Mr. Patel responded that he was trying to save his business because Reading Doctors were not returning the reports in time.  He explained that he only performed screening tests.  (*Id.*)  Judge Walls called Mr. Patel a "greedy fool," and asked whether he had anything else to say.  (*Id.* at 12).  He did not.

The Government then urged Judge Walls not to award an adjustment for acceptance of responsibility because Mr. Patel had defended the False Claims Act litigation by arguing that not all of the neurological tests were unsupervised, which he repeated in his sentencing memorandum. (Crim. ECF No. 42 at 13).  The Government argued that Mr. Patel had not accepted responsibility because he minimized his conduct by noting these were only screening tests, and in his written submissions, he stated that if a patient had a risk factor, the referring doctor would have sent him/her to a hospital.  (*Id.* at 15).  The Government suggested that Mr. Patel had shown a complete lack of contrition, and recommended a top of the Guidelines sentence.  (*Id.* at 16).

Judge Walls invited defense counsel to respond to the Government's contention that Mr. Patel had not accepted responsibility based on "his later own words."  (*Id.* at 19).  Defense counsel urged Judge Walls that Mr. Patel's explanation of his conduct was not intended to detract from his acceptance that his conduct was wrong.  (*Id.*)  Counsel said he knew that Mr. Patel, in his heart,

was not denying the risk his conduct posed.  (*Id.*)  He was only trying to explain that his performance of the diagnostic tests, his life's work, had some value.  (*Id.*)  In the end, Judge Walls was not satisfied that Mr. Patel showed contrition for his crime, and he denied an adjustment for acceptance of responsibility.  (Crim. ECF No. 42 at 25).

> Because "[c]redibility and demeanor play a crucial role in determining whether a person is genuinely contrite," and "[b]ecause the sentencing judge has the unique opportunity of observing the defendant ... and evaluating acceptance of responsibility in a live context," the finding of the sentencing court is entitled to great respect.

*United States v. Burns*, 925 F.2d 18, 20 (1st Cir. 1991) (quoting *United States v. Royer*, 895 F.2d 28, 29 (1st Cir. 1990)).  The record supports the conclusion that it was Mr. Patel's own statements and demeanor that failed to convince Judge Walls of his acceptance of responsibility.  Thus, Mr. Patel has failed to establish that but for his counsel's ineffective argument at sentencing, he would have received the three level adjustment to his base offense level under § 3E1.1.  Therefore, this ineffective assistance of counsel claim fails.

## IV.    CONCLUSION

Defense counsel performed within the prevailing professional standards, and Mr. Patel's ineffective assistance of counsel claims are based on speculation that he might have been better off with a different strategy.  "Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight…."  *Strickland*, 466 U.S. 668, 669 (1984).  Therefore, the amended § 2255 motion is denied.

## V.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because jurists of reason could not disagree with this Court's conclusion that Mr. Patel's ineffective assistance of counsel claims are without merit, Mr. Patel has failed to make a substantial showing of the denial of a constitutional right, and no certificate of appealability shall issue.

An appropriate order follows.

_____
Hon. Susan D. Wigenton,
United States District Judge
Dated: January 23, 2023